## ANDERSON & COMPANY *v.* HOLBROOK.

1. The original petition was subject to demurrer, and the proposed amendment did not cure the defects.
2. If a broker was privy to wagering contracts for fictitious or option futures, and brought the parties together for the very purpose of entering into such illegal agreements, he could not recover for advances made by him on account of his principal in forwarding such illegal contracts.

Submitted April 18,—Decided May 14, 1907.

Complaint. Before Judge Holden. Hart superior court. May 24, 1906.

L. J. Anderson & Company brought suit against J. W. Holbrook for moneys advanced as brokers, and, among other things, alleged as follows: They were engaged in the business of brokers in the

city of Atlanta, and at the request of Holbrook they purchased for him during the months of October, November, and December, 1904, various articles set out in a bill of particulars attached to the petition (containing such items as, "Nov. 16, 10 C. F. I., 50 ct'n. $6.25;" "Nov. 30, 3 Dec. oats $100.00;" "Dec. 12, 25 Jan. ct'n., $202.50;" "Dec. 17, 10 U. P. $5.00;" "Dec. 28, 50 Jan. p'k., 10 Jan. ribs, 1 Ma. wht. $137.88;" "Dec. 28, 350 Mch. ct'n., $3,133.-75," etc.), amounting, in the aggregate, to $5,523.76. Plaintiffs advanced the money or margins for such purchases, under an agreement with Holbrook, by which he was to reimburse them for such advances, including all margins. After having purchased the articles set out in the petition, under the agreement, the markets failed and Holbrook refused to reimburse plaintiffs or to make the necessary advances for margins as he had agreed to do, and as by the custom of the trade he was bound to do. For this reason the transactions were closed out on December 28, 1904, and plaintiffs thereby sustained a loss of $5,523.76. Petitioners alleged that on this amount Holbrook, as shown by their account with him, was entitled to certain credits set out in a bill of particulars attached to the petition (such as, "Nov. 5, 25 Dec. ct'n., $2.50;" "Nov. 17, check $250.00;" "Nov. 19, 2 May wht. $21.87;" "Dec. 1, 1 May corn, $3.12;" "Dec. 17, 10 St. P. $2.50;" "Dec. 20, 50 July ct'n. $15.00," etc.), amounting in all to $4,883.11, leaving a balance due them of $640.65, with interest thereon from December 28, 1904. Plaintiffs acted bona fide as brokers, the agents of Holbrook, and the contract under which they paid out the money has been fully executed.

Upon the trial the defendant demurred to the petition generally, and also specially on the following grounds: It did not show what articles were purchased for the defendant, the price paid therefor, from whom bought, where bought, when sold, to whom sold, and the price realized therefor. It failed to show what advances were necessary to be made as margins by the defendant. It failed to show what articles were closed out for the defendant, whereby loss was sustained, to whom sold, when and where sold, and the price realized, or what benefit accrued to defendant on account of such purchase. It failed to allege sufficient facts to show what the "custom of the trade" was, or to state that the defendant was familiar with the custom of the trade. Plaintiff's petition does not

contain a legal cause of action, because upon its face the contract shows that it involved and was related to what is known as "futures." It was a contract purely speculative, in which no actual delivery of the articles bought or sold was intended or contemplated between the parties; and under the laws of Georgia such a contract is illegal and void, and contrary to public policy.

The plaintiffs moved to amend their petition substantially as follows: The contracts for the purchase of cotton for future delivery were made by the plaintiffs, as brokers for the defendant, with the O'Dell Company of Cincinnati, Ohio, and were for the purchase and delivery of the cotton in the amounts and at the prices stated, in the city of New York, at the times stated. When the contracts for the purchase of cotton were made or executed by the plaintiffs,. their commissions as brokers were then and there earned. The original margins required by the O'Dell Company to be deposited with them, as a condition precedent to the executing of the contracts, were furnished by the defendant, and the amounts sued for were subsequently furnished by the plaintiffs "in order to keep the trades afoot," such amounts being furnished at the request of the defendant, "purely as a favor on the part of the plaintiffs." The court rejected this amendment, sustained the demurrer, and dismissed the case. The plaintiffs excepted.

*A. G. & Julian McCurry* and *Anderson & Anderson,* for plaintiffs.

*James H. Skelton,* for defendant.

LUMPKIN, J. (After stating the facts.)

1. The original petition was clearly demurrable. Such descriptions of the articles referred to as "10 C. F. I.," "50 ct'n.," "10 U. P.," and "1 Ma. wht't." may be quite intelligible to those initiated in the class of dealings involved, but they can hardly be said to plainly and distinctly describe the articles alleged to have been bought. The terms of the alleged purchases were not given, nor the prices paid or to be paid for the things bought. The amounts set opposite these various items purported to be the margins advanced by the plaintiffs for the defendant, not the purchase-price of the articles. If it should be contended that these figures represent the prices paid or to be paid, then there would be no statement of the amount. of margins advanced by the plaintiffs. They sued for the exact balance arising from this account, as being the amount due them on.

account of the advancing of such margins. There was no allegation in the petition as to when the articles were sold or at what price. It stated that the defendant failed and refused to make the proper and necessary advances for margins, etc.; but it was not shown what advances were necessary and proper, nor how the transaction was "closed out." It alleged that such advances of margins were in accordance with "the custom of the trade," but it failed to show what was the custom, or to what trade it appertained.

The proposed amendment did not undertake to cover the entire lot of articles mentioned in the account attached to the original petition, but stated only that the contracts for purchase of cotton for future delivery were made with the O'Dell Company, of Cincinnati. It alleged that such contracts were for the delivery of the cotton in the amounts and at the prices stated in the original petition, in the city of New York, at the time stated in the original petition. As already pointed out, no prices were stated in the petition; and this was made clear by the amendment itself, which alleged that "the original margins required by the said O'Dell Company to be deposited with them, as a condition precedent to the making or executing of the said contracts, were furnished by the defendant, and the amounts sued for in the above-stated petition are amounts which were subsequently furnished by plaintiffs upon the exhaust of the said margins, in order to keep the trades afoot." It was said that these advances were made purely as a favor on the part of the plaintiffs; but it also appears that when the contracts were made or executed by the plaintiffs as agents of the defendant, "plaintiffs' commissions as brokers were then and there earned." This amendment did not cure the defects in the original petition, and was properly rejected.

2. A contract for the actual sale and delivery of property at a future time is not illegal; but a contract for the sale of goods to be delivered at a future day "where both parties are aware that the seller expects to purchase himself to fulfill his contract, and no skill and labor or expense enters into the consideration, but the same is a pure speculation upon chances, is contrary to the policy of the law, and can be enforced by neither party." Civil Code (1895), §3537. Pleadings are to be taken most strongly against the pleader. But it is scarcely necessary to invoke this rule in order to see from the terms of the petition that the transactions here in-

volved belong to that class of gambling contracts commonly known as dealings in futures. We think the plaintiffs' own pleading is sufficient to make this apparent even to those who claim no intimacy with the "bull" rings and "bear" pits of finance. A man residing in a small country town in Hart county gave orders to brokers in the city of Atlanta, covering a somewhat widely diversified list of objects, such as "Jan. cotton," "Dec. oats," "Jan. ribs," "Ma. wht.," "10 C. F. I.," "10 U. P.," and 190 shares of stock. The brokers dealt with a corporation in a distant city as to a part of the transaction, and as to the balance it does not appear with whom they dealt. The allegations do not disclose that these were purchases for actual delivery (save a general reference in the rejected amendment as to delivery of cotton), or the amount of purchase-money paid or to be paid. It seems quite clear that the whole matter was simply a speculation in futures, a putting up of margins "to keep the trades afoot," a requirement of more margins when the market declined, and a failure to put up such margins, by reason of which "the transactions were necessarily closed out."

It is contended, however, that even if this be true, the brokers advanced such margins for their principal, and are entitled to recover the money so expended. This was held in *Warren* v. *Hewitt,* 45 *Ga.* 501. The decision so made was cited, evidently without approval, in *Heard* v. *Russell,* 59 *Ga.* 25 (13). In *Champion* v. *Wilson,* 64 *Ga.* 184, 188, those decisions are again cited without approval. In the opinion it was said that "if it were an original question, one might well hesitate." In *Thompson* v. *Cummings,* 68 *Ga.* 124, the ruling announced in the case of *Warren* v. *Hewitt,* 45 *Ga.,* supra, was again referred to. There suit was brought on a draft. One plea was that it was drawn to pay losses upon the purchase of cotton futures, which was a mere speculation in chances. Mr. Justice Crawford, after stating certain evidence bearing on the subject, said: "The foregoing testimony, without anything more, makes Cummings & Co. the sellers, Thompson Bros. the buyers, and no agency about the whole transaction, except that of Lathrop & Co., who bought for Cummings & Co. to cover 'their operations with their customers.'" As the court held that there was no question of expenditure by agents for their principals shown in the case, the mere statement of what would have been the law if there had been such an expenditure was not a direct adjudication.

In *Cunningham* v. *National Bank,* 71 *Ga.* 400, 405, the ruling in 45 *Ga.* 501, 59 *Ga.* 26, and 64 *Ga.* 184, supra, was again doubted. Mr. Justice Blandford said: "We are not prepared to say that we will be bound in the future by the decisions last referred to, when the same are reviewed as the law directs, or what our judgment may be upon such consideration." It was held that contracts for the purchase and sale of cotton futures were immoral, illegal, and contrary to public policy. When the same case was before this court for the second time (75 *Ga.* 366), it was held, that "Where a broker is privy to such a wagering contract, and brings the parties together for the very purpose of entering into the illegal agreement, he is particeps criminis, and can not recover for services or losses incurred by himself in forwarding the transaction. Where a note was given to brokers for money which was to be expended by them in purchasing cotton futures for and on account of the maker, and no money went into his hands, such note was void. The case in 45 *Ga.* 501, differs from this; but in so far as it conflicts with the present ruling, it is overruled." The difference suggested would not affect the present case, and it may be doubted whether it furnished any substantial difference between those two cases.

In *Western Union Tel. Co.* v. *Blanchard,* 68 *Ga.* 299 (6), it was held, that "Although a speculation in cotton futures may be an illegal contract, yet an agent who incurs expense or loss on behalf of his principal in carrying out such contract may recover the amount thereof from such principal. If such loss or expense was caused by the improper transmission of a telegram from the principal to the agent, the former, on paying the loss to the agent, would have sustained a damage through the negligence of the telegraph company for which he could recover from it." This was not directly reviewed in the case of *National Bank* v. *Cunningham,* 75 *Ga.,* supra, but in *Cothran* v. *Western Union Tel. Co.,* 83 *Ga.* 25, it was declared that "Contracts for fictitious or option 'futures,' made in Georgia, being illegal, whether between principal and principal, or broker and principal, where both parties are in complicity touching the unlawful purpose, such contracts, or the loss or gain resulting from them, can not be invoked to measure the damages sustained by the sender of a telegram in consequence of a mistake made by the company in transmitting the message." Re-

ferring to the case of *Western Union Tel. Co.* v. *Blanchard,* supra, it was said that "Since the case of *Bank* v. *Cunningham,* 75 *Ga.* 366, the principle of the former case has stood virtually overruled." It was later directly overruled in *Moss* v. *Exchange Bank,* 102 *Ga.* 808. See also *Raleigh & Gaston R. Co.* v. *Swanson,* 102 *Ga.* 761. In *Singleton* v. *Bank of Monticello,* 113 *Ga.* 527, it was held that mere knowledge by the lender of money that the borrower intended to use it for an illegal or immoral purpose would not prevent a recovery of the money loaned; yet if the lender in any manner aided the borrower in carrying into effect the unlawful design, or participated therein, he could not recover. In the opinion Mr. Justice Lewis quoted with approval the following language from the decision in Waugh *v.* Beck, 114 Penn. St. 422: "It is not enough to defeat recovery by the lender that he knew of the borrower's intention to use it in a gambling transaction, in purchasing commodities on margin; he must have known that the borrower was purposing such use of the loan and must have been implicated as a confederate in the transaction, though not necessarily for gain." See also *Kessler* v. *Pearson,* 126 *Ga.* 725. A like principle is applicable to the case of a broker and the party for whom he claims to have made advances. If the broker is a privy to the wagering contract and brings the parties together for the very purpose of entering into the illegal agreement, and advances money for margins in furtherance of the transaction, he can not recover it. If any other rule were established, the result would be that the broker would not be allowed to recover directly on account of illegal and immoral transactions, which the law of this State declares these fictitious dealings in futures to be, but could accomplish the same result by indirection.

*Judgment affirmed. All the Justices concur.*